UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

VERSUS

BRANDON BOURGEOIS

CRIMINAL ACTION

NO. 16-008-JJB-EWD

**RULING**

This matter is before the Court on a Motion to Suppress Evidence and Statements (Doc. 179) brought by the Defendant, Brandon Bourgeois. The Government filed an Opposition (Doc. 189). An evidentiary hearing was held on the Motion on August 2, 2016. Both parties submitted post hearing memoranda (Docs. 336 and 343). For the reasons stated below, the Defendant's Motion is **DENIED** in its entirety.

I. FACTUAL BACKGROUND[1]

This case involves a search of a residence after a mother (Sue Toler), a son (the Defendant, Brandon Bourgeois), and his wife (Kacie Bourgeois) all gave their consent to search. The Defendant and his wife now claim that their consent to search was coerced. The mother maintains that her consent was voluntary.

Sue Toler is the Defendant's mother. Since 2008, she has been caring for her ailing father, Jack Toler. Ms. Toler lives at 4720 Lavey Lane in Baker, LA. She has lived there since the 1970s. Her house is directly across from her father's house, 4802 Lavey Lane. Beginning in 2008, Ms. Toler was given power of attorney over her father. She performed many caretaking duties for him.

---

[1] The Court describes the credible evidence that was introduced at the hearing. "The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts. At a suppression hearing, it is 'well within the trial court's discretion' to weigh the evidence and make credibility determinations regarding conflicting testimony." *United States v. Jones*, 187 F.Supp.3d 714, 723 (M.D. La. 2016) (citing *Norman v. Stephens*, No. H–13–0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013)).

1

She bought his groceries, took care of the bills for his house, and checked on him often. By late 2015, she was going to his house four to six times a day.

In the summer of 2015, Ms. Toler invited her son, Brandon Bourgeois (the Defendant), and his wife to move into Jack Toler's house. Ms. Toler was having trouble caring for her father. His health had deteriorated, and she needed help with him. Mr. Bourgeois, his wife, and their children moved into 4802 Lavey Lane to help care for Mr. Toler.

In late December 2015, Ms. Toler went to 4802 Lavey Lane to help with the laundry. While cleaning, she found a bag of what she later learned was methamphetamine. She was suspicious of the bag and took it back to her house. After thinking about what to do and deciding that if her son was in trouble she wanted to get him help, she eventually called a friend who was a deputy. The deputy put her in contact with Corporal Eric David ("David") at the East Baton Rouge Sheriff's Office. Ms. Toler cooperated with Corporal David, and after speaking with him, she invited the officers to search 4802 Lavey Lane. Ms. Toler and Corporal David agreed that the officers would come to the residence on January 7, 2016.

On the morning of January 7, 2016, Corporal David conducted a briefing with some of his officers before going to 4802 Lavey Lane. He spoke with Ms. Toler that morning, and Ms. Toler agreed that she would allow them to enter the residence when they arrived. At the briefing, Corporal David explained to his officers that they would be conducting a knock and talk. He told the officers that they were going to speak with Ms. Toler and her son, Mr. Bourgeois.

Upon arriving at the residence, the officers encountered Mrs. Kacie Bourgeois, Mr. Bourgeois' wife. Shortly thereafter, Ms. Toler arrived from her house after seeing the officers pull up. Ms. Toler invited the officers into the house and Mrs. Bourgeois and Ms. Toler sat in the kitchen. Additionally, Mr. Bourgeois was located by Sergeant Courrege in a small utility room off

the house. Sergeant Courrege asked Mr. Bourgeois to step inside the house, and he agreed to come sit in the kitchen and talk to the officers. He sat down with his wife and his mother.

While in the kitchen, the officers read all three individuals their *Miranda* rights. They indicated that they understood their rights and continued to speak with the officers. After the *Miranda* rights were read, the officers discussed the Consent to Search form with the three individuals. The Sherriff's Office uses a standard form. Once the officers explained the form, all three individuals signed the form giving the officers consent to search the residence. After this form was signed, the officers searched the house. They found drug paraphernalia, marijuana, methamphetamine, and a gun in the utility room where they had initially located Mr. Bourgeois.

After locating these items, the officers presented them to the Defendant who was still in the kitchen. At first, the Defendant was apprehensive about speaking to the officers about the items. Both Mrs. Bourgeois and Ms. Toler encouraged him to cooperate. He eventually admitted that the items were his.

Ms. Toler said the officers were very respectful and professional during the entire interaction. She said they even kept the search quiet so as not to wake Mr. Toler who was asleep in the back of the house.

At the hearing, Mrs. Bourgeois claimed that she was overwhelmed by the officers. She claimed that she did not feel like she could refuse the search, and that she was not given a chance to object to the search. She also claimed that she did not remember signing the Consent to Search form until after the search was already done. Given that the narrative described by Corporal David, Sergeant Courrege, and Ms. Toler is almost exactly the same, the Court finds their testimony credible. The Court finds that the Consent to Search form was signed *before* the officers searched the residence.

**II.    LAW & ANALYSIS**

After the hearing, the Defendant argues that the evidence and his statements should be suppressed for two reasons. First, he argues that his consent to search was involuntary, and based on *Georgia v. Randolph*[2], the evidence found as a result of that search must be suppressed. Second, he argues that his *Miranda* waiver was involuntary. The Court finds both of these arguments unpersuasive.[3]

**A.    All Three Individuals Gave Their Voluntary Consent, But Even if Mr. and Mrs. Bourgeois' Consent Was Involuntary, Ms. Toler's Voluntary Consent Justifies the Search.**

While a warrant is generally required to search a home, the Supreme Court has long recognized that certain warrantless searches are permissible.[4] Where a search is conducted without a warrant, the Government bears the burden of proving that the search was valid.[5] A law enforcement officer does not need a warrant to search a home when the owner or occupant of that home voluntarily consents to the search.[6]

In order to determine if an occupant's consent was voluntary, a court should consider six factors ("the *Freeman* factors"): (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation; (4) his awareness of his right to refuse to consent; (5) the defendant's education and intelligence; (6)

---

[2] 547 U.S. 103 (2006).
[3] It is unclear if the Defendant, in his post-hearing memorandum, is still urging the illegal detention argument that he made in his pre-hearing brief. To the extent he is still arguing that his consent was the result of an illegal detention, and therefore the evidence found as a result of that tainted consent should be suppressed, the Court finds this argument unpersuasive. No illegal detention initially occurred here because Mr. Bourgeois willingly accompanied the officers inside the house.
[4] *Fernandez v. California*, 134 S.Ct. 1126, 1132 (2014).
[5] *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005).
[6] *Fernandez*, 134 S.Ct. at 1132.

and his belief that no incriminating evidence will be found.[7] All six factors are relevant, but no single factor is dispositive.[8]

A court must undertake an additional inquiry when there are multiple occupants present at a residence. Whose voluntary consent is needed—all of the occupants who are present or just the consent of one occupant? When there are multiple individuals who have authority over a residence, the search is justified if an individual who is *present* at the residence consents to the search.[9] The consent of one who has actual or apparent authority over a premises is valid as against an absent, nonconsenting person with whom that authority is shared.[10]

While consent by one who has authority over a residence is generally sufficient to justify a warrantless search, the Supreme Court has recognized a very narrow exception to this rule.[11] In *Georgia v. Randolph*, the Court held that "a physically present inhabitant's express refusal of consent to a police search [of his residence] is dispositive as to him, regardless of the consent of a fellow occupant."[12] In a later case, the Court further explained that *Randolph* should be construed as a narrow exception: "[I]t applies only when the objector is standing in the door saying 'stay out' when officers propose to make a consent search."[13] Additionally, while officers must honor an objection *if made*, they are not required to inform occupants of their right to make such an objection.[14] In summary, when there are multiple individuals present at a residence, all of whom have the authority to authorize a search of the residence, law enforcement only needs the consent

---

[7] *United States v. Freeman*, 482 F.3d 829, 832 (5th Cir. 2007).
[8] *Id.*
[9] *Fernandez*, 134 S.Ct. at 1133.
[10] *Id.*
[11] *Id.*
[12] 547 U.S. at 122-3.
[13] *Fernandez*, 134 S.Ct. at 1136.
[14] *See Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973).

5

of one of those individuals to conduct a search. However, if any individual objects to the search, the officers are prohibited from continuing.

Furthermore, where multiple occupants consent to a search, and one occupant's consent is voluntary while the other's is not voluntary, the search is still lawful based on the voluntary consent of the first individual.[15] In *Denton*, a defendant appealed a denial of his motion to suppress. He argued on appeal that evidence was introduced at trial which was uncovered based on his involuntary consent to search. He claimed that he consented to a search of his hotel room but that he gave consent while he was under the influence of drugs and alcohol. He also claimed that he was intimidated by the presence of six officers and that was why he ultimately signed the consent to search form. The Eleventh Circuit ultimately affirmed the district court's finding that the defendant's consent was voluntary. In the alternative, the court held that it did not matter if the defendant's consent was voluntary because his co-occupant's "consent was enough to justify the search."[16]

In other words, an involuntary consent is not equivalent to an express refusal to search such that the *Randolph* exception is triggered. The *Randolph* exception is incredibly narrow. It does not apply when one co-occupant consents and another involuntarily consents.[17] It does not apply when one co-occupant consents and another co-occupant remains silent.[18] It does not even apply when one co-occupant consents and another co-occupant "implicitly refuses" to allow a search.[19] It only

---

[15] *United States v. Denton*, 535 Fed. App'x 832, 836 (11th Cir. 2013); *see also United States v. Freeman*, 14-CR-25-CC-SL, 2014 WL 2743249, at *4 (E.D. Tenn. Jun. 16, 2014) ("Defendant argued at the hearing that his intoxication might have rendered his consent or statement involuntary. This argument fails for several reasons. First, as it relates to consent to enter the apartment, even if Defendant was intoxicated, consent was also provided by…a co-tenant of the apartment. No evidence was presented to suggest [the co-tenant] was intoxicated. In *Fernandez v. California*, the Supreme Court held that unless the defendant is physically present and objecting to the search, the search is valid if a co-tenant consents to it.").
[16] *Denton*, 535 Fed. App'x at 836.
[17] *Id.*
[18] *United States v. Harris*, 526 F.3d 1334, 1339 (11th Cir. 2008).
[19] *United States v. Moore*, 770 F.3d 809, 813 (9th Cir. 2014).

6

applies when one co-occupant consents and another co-occupant *expressly* says something to the effect of "stay out." Only in that narrow instance will officers be precluded from conducting a search.

Turning to the facts, the Court finds that the search was lawful because all three individuals voluntarily consented to the search of the entire house. Alternatively, even if Mr. and Mrs. Bourgeois' consent was involuntary, the search was still lawful based on Ms. Toler's voluntary consent and Mr. and Mrs. Bourgeois' failure to expressly object to the search.

The Defendant does not challenge Ms. Toler's authority to grant the officers the right to search 4802 Lavey Lane. Additionally, Defendant admits that Ms. Toler voluntarily consented to the search.[20] Therefore, it is undisputed that at least one of the three individuals with the authority to consent to search 4802 Lavey Lane, gave that consent voluntarily.

The Defendant argues that neither his consent nor his wife's consent was voluntary. The Court finds otherwise. After reviewing the *Freeman* factors, the Court agrees with the Government's assertion that Mr. and Mrs. Bourgeois consented to a search of the home.[21] The Court finds that the consent was voluntary for three main reasons. First, there was no police coercion here. As Ms. Toler testified, the officers were respectful and professional. They remained quiet while conducting the search. They did not threaten Mr. Bourgeois with weapons. Second, the credible evidence shows that Mr. and Mrs. Bourgeois were aware they had a right to refuse a search, at least with respect to their bedroom. The officers testified that they read Mr. and Mrs. Bourgeois the Consent to Search form which explicitly stated "I understand I have the right to refuse consent." Neither Mr. nor Mrs. Bourgeois objected to a search of the residence or their bedroom and they signed the form. This weighs in favor of finding that their consent was voluntary.

---

[20] Def.'s Post Hearing Memo 5, Doc. 336.
[21] *See* Government's Post Hearing Memo 5-8, Doc. 343.

Third, the entire atmosphere was calm and cooperative. While Mr. Bourgeois may have been initially apprehensive about cooperating, he eventually cooperated fully which weighs in favor of finding that his consent was voluntary.

Alternatively, even if Mr. and Mrs. Bourgeois' consent was involuntary, the search of the residence was still lawful because Ms. Toler's consent was clearly voluntary and neither Mr. nor Mrs. Bourgeois expressed any objection to the search. Defendant's argument appears to be that the *Randolph* exception applies to his situation; he argues that he would have refused had he known that by refusing he could stop the search. He repeatedly cites to Corporal David's statement at the hearing in which David said that he was not going to stop a search of the residence based on a refusal by Mr. or Mrs. Bourgeois except possibly as to their private bedroom.[22] While the Court agrees that Corporal David misstated his legal authority in response to a *speculative question* at the hearing (in other words, *had* Mr. Bourgeois refused to consent to the search of the residence, David would have been precluded from searching), the facts of what happened at the residence are not in dispute.[23] Neither Mr. nor Mrs. Bourgeois expressed their refusal. Therefore, *Randolph* does not apply to their situation. Like the defendant in *Denton* who was not able to argue that the search was unlawful because his involuntary consent was irrelevant where his co-occupant's consent was voluntary, the Defendant here cannot rely on his allegedly involuntary consent to invalidate the search where his mother voluntarily consented. Defendant's attempt to fit his situation into the narrow *Randolph* exception, which requires an express refusal, is unavailing.

---

[22] Def.'s Post Hearing Memo 3, Doc. 336; Hearing Tr. 26, Doc. 309.
[23] The Court finds it important that the facts clearly show that neither Mr. nor Mrs. Bourgeois objected to the search. At the hearing, Corporal David was asked "Now, *if* [Mr. or Mrs. Bourgeois], or both of them told you, 'No, we don't want you to search the house,' are you going to turn around and pack it up?" He responded "No." *Id.* (emphasis added). What Corporal David would have done had Mr. Bourgeois objected is irrelevant. Had Mr. Bourgeois objected to the search, the Court would be faced with a different situation, but the facts show that he never objected. Therefore, the search was valid.

The Court does not reach the Government's good faith exception argument because it finds that the search was lawful under two theories—all three individuals consented or Ms. Toler consented and the other two did not object.

### B. Mr. Bourgeois Waived His Miranda Rights

The Defendant also argues that his statements—that he owned the drugs and other incriminating evidence seized at the scene—were obtained in violation of *Miranda* and therefore should be suppressed. *Miranda* waivers are valid where they are made knowingly, voluntarily, and intelligently.[24] The Government bears the burden of proving a *Miranda* waiver by a preponderance of the evidence.[25] The Government need not show that a *Miranda* waiver was express; implicit waivers are also permissible.[26]

Here, the Court finds that the Defendant voluntarily waived his *Miranda* rights. The evidence shows that the officers read him his rights. He indicated that he understood his rights. He continued to cooperate, and he provided the officers information. The conclusion that he knowingly waived his *Miranda* rights is further bolstered by the fact that the Defendant had some prior dealings with the criminal justice system, and so he was likely familiar with the right to remain silent, the right to counsel, and the option to waive those rights.

---

[24] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[25] *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).
[26] *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010).

**III.    CONCLUSION**

For the reasons stated herein, Defendant's Motion to Suppress (Doc. 179) is **DENIED** in its entirety.

Signed in Baton Rouge, Louisiana, on February 9, 2017.

**JUDGE JAMES J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**